STATE OF NEBRASKA, APPELLEE, V. COURTNEY W. STARKS,
APPELLANT.

427 N.W.2d 297

Filed August 12, 1988.   No. 87-539.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The defendant, Courtney W. Starks, was convicted of first degree murder and use of a weapon to commit a felony. He was sentenced to life imprisonment for the murder and to 6 2/3 to 20 years on the weapons charge, the sentences to run consecutively.

He has appealed and contends that the trial court erred in failing to suppress his confession because it was the product or "fruit" of an illegal arrest, and in refusing to grant immunity to a defense witness regarding his encounter with the defendant on the night of the crime.

The record shows that on the evening of July 31, 1986, the victim, Linda Wierzbicki, stopped to visit with a friend, Connie

Sutherland. The two decided to meet at Wierzbicki's apartment later that evening for drinks and discussion. Sutherland estimated that Wierzbicki left at approximately 11:45 p.m.

Sometime around midnight, Scott Johnson heard a car pull into the parking lot located north of his apartment. About a minute later he heard a woman scream two or three times from the parking lot area. Johnson looked out his door and saw someone lying or bending over on the parking lot. He went to shut off his living room light so that no one could see him looking out. As he returned to the door to look out, he heard someone running. He looked outside, but did not see anybody. He then decided to look around the parking lot. While in the parking lot, he noticed a person walk past him approximately 5 or 6 feet away. He described the person as a black male, 6 feet tall and approximately 160 pounds, with short hair, dark pants, and a short-sleeved shirt with stripes. Johnson returned to his balcony and then saw a dark-colored Pontiac Trans Am automobile with retractable headlights accelerate rapidly and leave the parking lot. At that time he did not see the victim lying in the parking lot.

Danette Chase, who was staying at Johnson's apartment that evening, also saw a black male approximately 5 feet 10 inches tall, weighing 150 to 160 pounds, with short hair. She saw him get into a dark-colored Pontiac Trans Am or Firebird automobile and leave the parking lot very fast.

Meanwhile, Sutherland had tried calling the victim's apartment twice and received no answer. She arrived at the apartment building at approximately 1:45 a.m. and parked her car in the parking lot. She started walking toward the building when she saw the victim's body lying halfway under a parked car. An autopsy indicated that the victim had been stabbed repeatedly with a strong, very sharp knife and that her death was caused by external hemorrhaging from these wounds.

Shortly after the murder, at 12:17 a.m., Officer Donald J. Fiala, Jr., of the Omaha Police Division received a call regarding a personal injury motor vehicle accident at 35th and L Streets. Upon arriving, he saw a badly mangled black Pontiac Trans Am automobile. The driver of the vehicle, the defendant Courtney Starks, was taken to University Hospital for

treatment. Starks was informed that he was under arrest for driving while intoxicated, and a blood sample was drawn at the hospital. Sometime after 2 a.m., Officer Fiala transported the defendant to the police station for booking on several outstanding traffic warrants he had discovered. In the morning the defendant was sentenced to 30 days in jail and fined $500, and his license was suspended for 1 year.

That afternoon, as a result of a phone call, Officer James Wilson and Officer Clyde Nutsch attempted to locate defendant and discovered that he was incarcerated at the Douglas County corrections unit on traffic warrants. The officers signed the defendant out of the corrections unit and transported him to the Central Station, about $3^1/2$ blocks away. After reaching the station, Officer Wilson informed the defendant of his *Miranda* rights. The defendant did not request an attorney, did not invoke his right to remain silent, and agreed to talk with the officers. During questioning the defendant gave the officers a taped confession regarding the murder, which was received in evidence at trial.

With respect to the first assignment of error, the defendant argues that Officers Wilson and Nutsch arrested him at the Douglas County Correctional Center and transported him to Omaha police headquarters for questioning, when they lacked probable cause to believe he had committed the murder, and therefore his confession was the product of an illegal arrest which should have been suppressed. Specifically, he argues that the only information Wilson and Nutsch possessed at the time they arrested him was a "tip" received from an unknown person.

The record is devoid of any information concerning the specifics of the information given, the identity of the caller, or the reliability of the caller and the information given. The U.S. Supreme Court has held that a person is seized within the meaning of the fourth amendment when he or she is involuntarily taken to a police station for questioning, and therefore probable cause must exist for police officers to make such a seizure. *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). However, *Dunaway* involved a situation in which the defendant was not in custody prior to

police contact.

Other jurisdictions which have considered this issue have found that persons already in custody do not possess the same fourth amendment rights as those who are not in custody. In *State v. McCarthy*, 197 Conn. 247, 496 A.2d 513 (1985), the defendant was arrested by Westport police on charges unrelated to those at issue in his appeal. The Westport police contacted police in Wilton, Connecticut, where the defendant was a suspect in certain burglaries, and informed them that the defendant was in custody. Two police officers from Wilton spoke with the defendant in the Westport jail, then took him for a drive through Wilton, at which time the defendant incriminated himself in several burglaries. The defendant contended on appeal that the actions of the Wilton police constituted an arrest for which there was no probable cause and that any confession was a direct result of an illegal arrest. The court held that under *Dunaway, supra*, the defendant was under arrest during his trip to Wilton, but that it was *not* an arrest by Wilton police. Instead, the court found that custody had been transferred from the Westport police to the Wilton police and that

> Once a prisoner is lawfully in custody and thus deprived of his freedom, he has no constitutional basis for complaining about the identity of those assigned to hold him by the arresting authority. The temporary transfer of the defendant's custody from the Westport police authorities, who had arrested him legally, to the Wilton officers did not constitute a new arrest requiring those officers to have justification for such an arrest. We conclude that the lawful deprivation of the defendant's liberty resulting from his unchallenged arrest by the Westport police was still in force at the time he made the statements concerning his involvement in the Wilton offenses. Those statements, therefore, were not the product of an illegal arrest, as the defendant asserts and his claim of a fourth amendment violation is without merit.

197 Conn. at 256, 496 A.2d at 518-19.

Similarly, in *Scott v. State*, 726 P.2d 360 (Okla. Crim. 1986),

the court rejected the defendant's argument that his removal from jail to the police station for questioning on an unrelated crime amounted to an illegal arrest. The police had received an anonymous telephone call and, as a result, had taken the defendant to the police station for questioning. The defendant was given his *Miranda* rights and asked if he would submit to giving hair and saliva samples, to which he consented. Those hairs implicated him in a rape committed some 5 months earlier, and he was subsequently convicted. On appeal he argued that the unexplained and uncorroborated phone call did not provide probable cause to arrest him, and therefore the introduction into evidence of the hair samples was the fruit of an illegal arrest. The court disagreed and held that the act of transferring a person in custody at the jail to the police station for questioning did not amount to an arrest under Oklahoma law, which defines arrest as " 'the taking of a person into custody, that he may be held to answer for a public offense.' " *Id*. at 361.

The same rationale was also followed in *United States ex rel. Brown v. Rundle*, 450 F.2d 517 (3d Cir. 1971). Therein, the defendant, who was already confined at the Youth Study Center on an unrelated charge, was implicated by an eyewitness as having been involved in a murder. The defendant was transferred to the police department for questioning and then confessed. On appeal he contended that his removal from the Youth Study Center constituted an illegal arrest. The court rejected his argument and held that because the defendant was already in custody by reason of his commission of another offense, there was no necessity for rearresting him.

Finally, in a factually unsimilar case, the U.S. Court of Appeals for the Eight Circuit has held that a person who is already under arrest and in police custody cannot be "rearrested." In *Garionis v. Newton*, 827 F.2d 306 (8th Cir. 1987), the plaintiff was arrested for an incident at a polling place where he had attempted to vote. The plaintiff had been wearing a small pin on his lapel which demonstrated his opposition to a proposed amendment. When asked by a clerk to remove the pin, he refused. He was then told by a chief election judge that the pin violated an Arkansas law regarding electioneering at polling places. The police were called, and a

Deputy Sheriff Newton requested that the plaintiff either leave the voting line or remove the pin. Upon refusing to do either, he was arrested by Newton and taken outside. The plaintiff was then taken by Police Officer Barr to the police station and booked. On appeal he contended that the second officer lacked probable cause to arrest him. The court rejected his argument and stated:

> The flaw in this argument is that a person who is already under arrest and in police custody cannot be "rearrested." An arrest presumes that the person arrested was at liberty, free from police custody, before the arrest. This premise does not hold when the subject is already in custody of law-enforcement officers, see *Kelley v. Swenson*, 481 F.2d 86, 88 (8th Cir.1973); see also *United States v. Rundle*, 450 F.2d 517, 520 (3d Cir.1971); *Hayes v. United States*, 367 F.2d 216, 221 (10th Cir.1966). At least when, as here, there is no allegation (nor even any basis for an allegation) that Newton released Garionis from custody, there was no subsequent arrest, and no need for probable cause, when Barr took custody of Garionis from Newton.

827 F.2d at 310.

While it is true that prisoners do not forfeit all of their rights under the fourth amendment upon incarceration, they do not retain the same measure of protection afforded non-incarcerated individuals. *State v. Kerns*, 201 Neb. 617, 271 N.W.2d 48 (1978).

The defendant's assignment of error fails because he was not arrested by Officers Wilson and Nutsch when he was taken to Omaha police headquarters for questioning. Since there was no new arrest, legal or otherwise, his confession was not the fruit of an illegal arrest, and the trial court did not err in refusing to suppress the confession.

The second assignment of error relates to the testimony of a defense witness. Eric Turner, an acquaintance of the defendant, testified that on or about the night of the murder, he and the defendant drank alcoholic beverages and smoked marijuana together. Turner denied giving the defendant any of the drug PCP. When Turner was asked by defense counsel whether he

previously had ever used PCP, he invoked his fifth amendment right to remain silent. When defense counsel questioned Turner as to whether he had smoked PCP while in California, where he had been shortly before seeing the defendant on July 31, 1986, Turner again elected to remain silent. Finally, when defense counsel asked Turner if he had brought some controlled substances back from California, Turner again elected to remain silent.

Following Turner's testimony, defense counsel made an offer of proof as to how he believed Turner would testify if he were granted immunity. Based on an alleged conversation with Turner the previous evening, defense counsel stated that he expected that if Turner were granted immunity, he would testify that he had previously used PCP and that he brought back controlled substances, specifically the drug commonly referred to as "crack," from California. Defense counsel did not think Turner would testify that he had brought any PCP back from California.

The county attorney refused to request a grant of immunity and pointed out that Turner had already answered, in the negative, the most pertinent question: whether he had given any PCP to the defendant on the night of the murder. The trial court then stated that in light of Neb. Rev. Stat. § 29-2011.02 (Reissue 1985), the court did not have the authority to grant immunity and order a witness to testify absent a motion to do so by the county attorney or other prosecuting attorney.

Section 29-2011.02 provides:

> Whenever a witness refuses, on the basis of the privilege against self-incrimination, to testify or to provide other information in a criminal proceeding before a court or grand jury, the court, on motion of the county attorney or other prosecuting attorney, may order the witness to testify or to provide other information. The witness may not refuse to comply with such an order of the court on the basis of the privilege against self-incrimination, but no testimony or other information compelled under the court's order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except in a

prosecution for perjury, giving a false statement, or failing to comply with the order of the court.

While recognizing this statute, the defendant nevertheless contends that his due process right to a fair trial gives trial courts inherent authority to confer immunity. In support of his argument he cites to *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), in which the court recognized two situations where the due process clause would compel the granting of immunity to a defense witness. The first involves a situation where the government's decision not to grant immunity is made "with the 'deliberate intention of distorting the judicial fact finding process.' " *Id.* at 966. In such instance the court would have the remedial power to order an acquittal unless the government agreed to grant statutory immunity. This situation would not be applicable in the present case.

In the second situation the need for judicial immunity is triggered not by prosecutorial misconduct or intentional distortion of the factfinding process, but by the fact that the defendant is prevented from presenting exculpatory evidence crucial to his case. It is this second situation, in which the court in the *Smith* case stated that the court has authority to confer judicial (not statutory) immunity, that is at issue here.

Quoting its previous holding in *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), *cert. denied* 441 U.S. 913, 99 S. Ct. 2014, 60 L. Ed. 2d 386 (1979), the court explained that

> "while we think that the court has no power to order a remedial grant of statutory immunity to a defense witness absent a showing of unconstitutional abuse, a case might be made that the court has inherent authority to effectuate the defendant's compulsory process right by conferring a judicially ·fashioned immunity upon a witness whose testimony is essential to an effective defense."

(Emphasis omitted.) 615 F.2d at 969.

The court in the *Smith* case then went on to state that such immunity power by the court must be clearly limited, and required that (1) immunity must be properly sought in the district court; (2) the defense witness must be able to testify; (3) *the proffered testimony must be clearly exculpatory*; (4) *the testimony must be essential*; and (5) there must be no strong

governmental interests which countervail against a grant of immunity.

A number of courts have held there is no authority to grant judicial immunity to defense witnesses. In *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982), the court held that the district court may not grant immunity to defense witnesses simply because they may have essential exculpatory information which is unavailable from other sources.

> As noted by the Second Circuit in [*United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980)] the two major arguments against granting such judicial use immunity are that the immunity decision would carry the courts into policy assessments which are the traditional domain of the executive branch, and that the immunity would be subject to abuse.

> We find these arguments persuasive, and agree that the immunity decision requires a balancing of public interests which should be left to the executive branch. While a grant of use immunity theoretically does not improve the legal position of the person immunized, in that he still can be prosecuted for his crime, in practice the burden placed on the government to prove that any evidence obtained against the immunized suspect is not tainted by the suspect's statement can significantly impair future prosecutions. As the Second Circuit observed, "[C]onfronting the prosecutor with a choice between terminating prosecution of the defendant or jeopardizing prosecution of the witness is not a task congenial to the judicial function." *Turkish, supra*, at 776. *See id*. at 779 (Lumbard, J., concurring in part and dissenting in part). An immunity decision, moreover, would require a trial judge, in order to properly assess the possible harm to public interests of an immunity grant, to examine pre-trial all the facts and circumstances surrounding the government's investigation of the case. Such collateral inquiries would necessitate a significant expenditure of judicial energy, possibly to the detriment of the judicial process overall, and would risk jeopardizing the impartiality and objectivity of the judge at trial. *Id*.

Nor are we convinced that any safeguards imposed on the grant of judicial use immunity adequately reduces the risk of abuse by co-defendants, co-conspirators, friends, or employees. Whatever may be gained in fairness in a particular trial in which true exculpatory evidence may be obtained only through judicial use immunity, therefore, may well be lost through the subsequent effect of abuse on the integrity of the judicial process as a whole. Finally, we note that the fifth amendment privilege is not the only one which may suppress probative evidence from the judicial process; crucial facts, for example, also may be shielded from disclosure by the attorney-client or doctor-patient privilege. Although abrogating the fifth amendment privilege through general use immunity for exculpatory testimony may conflict less with important public interests than abrogating these other privileges, we conclude that the potential interference is nevertheless great enough that the legislature, rather than the courts, should decide on such a course.

665 F.2d at 639-40.

The U.S. Court of Appeals for the 10th Circuit has also rejected the notion of judicial immunity. In *United States v. Hunter*, 672 F.2d 815 (10th Cir. 1982), the defendant asked the court to follow the rule in *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), and to allow trial judges the authority to confer use immunity on witnesses when necessary to provide a defendant his full panoply of due process protections.

The court rejected the portion of the *Smith* case which gave the district courts such power, and concluded that "courts have no power to independently fashion witness use immunity under the guise of due process." 672 F.2d at 818. The court relied on *United States v. Graham*, 548 F.2d 1302 (8th Cir. 1977), for the proposition that the power to apply for immunity is the sole prerogative of the government.

In *United States v. Graham, supra* at 1315, the court stated: "The power to apply for immunity pursuant to 18 U.S.C. §§ 6002-03 (1970) is the sole prerogative of the Government being confined to the United States Attorney and his superior

officers."

In other decisions the U.S. Court of Appeals for the Eighth Circuit, while not recognizing authority to grant judicial immunity to defense witnesses, has stated that such immunity could be available only where the testimony would be clearly exculpatory.

In *United States v. Hardrich*, 707 F.2d 992 (8th Cir. 1983), the defendant contended on appeal that the trial court's failure to grant judicial immunity to two defense witnesses deprived him of a fair trial. Hardrich was tried and convicted on 11 counts of uttering forged U.S. Treasury checks. During trial he attempted to present the testimony of two witnesses, who both refused to testify on fifth amendment privilege grounds. The court held, on appeal, that "it is doubtful that a district judge may order 'judicial immunity' for a reluctant witness in this circuit." 707 F.2d at 994. For this proposition the court relied on its previous holding in *United States v. Graham, supra.*

Yet the *Hardrich* court, after expressing its doubt over the authority of a district judge to order judicial immunity, went on to state: "*However, assuming the district court has such authority, it is clear that the proffered testimony must be clearly exculpatory.* This showing was absent here. The proffered testimony of the two witnesses merely established incriminating evidence of a third party, but in no way exonerated the defendant here." (Emphasis supplied.) 707 F.2d at 994.

The issue was next raised in *U.S. v. Eagle Hawk*, 815 F.2d 1213 (8th Cir. 1987). The court again did not specifically state whether the district court had such authority, and instead stated:

> This court has previously indicated its doubt that [the] district court can grant judicial immunity. Even if the district court could grant judicial immunity, it should only do so where the evidence is *clearly exculpatory. United States v. Hardrich*, 707 F.2d 992 (8th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). This power is to be sparingly exercised. *Stewart v. Amaral*, 626 F.Supp. 192 (D.Mass.1985).

815 F.2d at 1217. The court went on to find that the witness' testimony was not clearly exculpatory and that therefore the

district court had not erred in refusing to grant judicial immunity.

Finally, in *U.S. v. Doddington*, 822 F.2d 818 (8th Cir. 1987), the court, in a footnote, discussed the issue of judicial immunity, and stated: "Judicial immunity has not been recognized in this Circuit." 822 F.2d at 821 n.1. The court then went on to note the holding in *Hardrich* and disposed of the issue by finding the proffered testimony was not clearly exculpatory.

In view of the facts in this case, we find it is not necessary to decide whether the rules stated in *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), should be adopted by this court. The testimony which defense counsel wanted to obtain from Turner was of doubtful relevance and was neither essential to the defendant's case nor clearly exculpatory.

By Turner's testimony, the defense was attempting to show that the defendant was without the requisite mental intent and was temporarily insane at the time of the murder because he might have smoked a marijuana cigarette laced with PCP. Yet the offer of proof indicated only that the testimony the defense was attempting to offer was that Turner had used PCP while in California and had brought a different drug, crack, back with him from California. This testimony would lend little, if any, support to the defendant's contention that he was mentally impaired at the time of the crime due to PCP, and was not clearly exculpatory.

There being no error, the judgment of the district court is affirmed.

AFFIRMED.