STATE OF NEBRASKA, APPELLEE, V. GARY J. BRUNZO, APPELLANT.
532 N.W.2d 296

Filed June 2, 1995.   No. S-94-952.

Steven M. Delaney and Patrick J. Boylan, of Hascall, Jungers, Garvey & Delaney, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ., and RONIN, D.J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to verdict, the defendant–appellant, Gary J. Brunzo, was adjudged guilty of felony murder, in violation of Neb. Rev. Stat. § 28-303(2) (Reissue 1989), that is, murder in the first degree, for killing while perpetrating or attempting to perpetrate the felonies of robbery or kidnapping. Having thereafter been sentenced to imprisonment for life, Brunzo appealed directly to this court as provided in Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 1994). He asserts, in summary, that the district court erred in (1) failing to suppress his statements to the police, (2) failing to compel certain deposition testimony and exclude trial testimony, (3) failing to sever the trial or grant a mistrial, (4) not dismissing the case for lack of sufficient evidence, and (5) erroneously instructing the jury. We affirm.

## II. SCOPES OF REVIEW

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. See *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992). However, to the extent questions of law are presented, an appellate court is obligated to reach a conclusion independent of that of the inferior court. *State v. Cox*, 247 Neb. 729, 529 N.W.2d 795 (1995).

## III. FACTS

The issues presented by the foregoing assignments of error require a fairly detailed summary of the factual record as it relates to (1) the commission of the crime, (2) its investigation, and (3) the conduct of the trial.

### 1. CRIME

Michael Campbell was shot in a gang–related incident, as the result of which he died on December 5, 1993. Later that day, 40 or 50 people gathered at Angelita DeLeon's house. The

general mood of those attending the gathering was one of depression or anger over Campbell's death.

Among those attending were Brunzo, Daniel Eona, Juan Carrera, Angel Huerta, and Doug Mantich, all members or former members of the "Lomas" street gang. Prior to arrival at the gathering, Huerta had ingested LSD. Carrera had been drinking alcohol and smoking marijuana. Carrera testified that Eona and Brunzo carried guns to the gathering. Huerta was carrying an automatic handgun. Carrera also testified that he wanted to shoot a member of the gang involved in the shooting of Campbell.

As people began leaving DeLeon's house between 11:45 p.m. on December 5 and 1 a.m. on December 6, Eona, Brunzo, Huerta, Carrera, and Mantich were standing outside the house. Diane Barrientos, Mantich's girl friend, also attended the gathering and was acquainted with Eona, Brunzo, Carrera, and Huerta. She too was standing outside DeLeon's house. When she asked Eona and Carrera if they needed a ride, Eona responded that he "was going to get a G–ride." Barrientos understood "G–ride" as meaning to steal an automobile. Barrientos did not see Eona and Brunzo for approximately 10 minutes, but Huerta and Carrera remained in front of DeLeon's house. Carrera heard Eona say that he wanted to "jack somebody," which Carrera understood to mean that Eona wanted to steal an automobile. Carrera stated that he wanted a "G–ride," meaning he wanted a nice one. Before leaving the gathering, Huerta told Mantich that in retaliation for Campbell's death, Huerta would "like to do a drive–by," meaning to "go by and shoot somebody's house."

Michael Blankenau operated a cleaning business, in connection with which he employed Henry Thompson, a friend and the victim of the events at issue here. Blankenau had loaned his 1989 Dodge Caravan minivan to the victim for the victim to use in the completion of some cleaning work.

Blankenau had arranged to meet the victim on December 5 to finish a job. The victim arrived at the business at approximately 11:30 p.m., driving the minivan. Blankenau and the victim finished at approximately 11:50 p.m. and proceeded to another location, where Blankenau paid another employee.

Blankenau and the victim then went to a nearby restaurant, arriving shortly after midnight on December 6 and leaving there at approximately 2 a.m. The victim drove away in the minivan; Blankenau drove away in another automobile.

According to his deposition testimony, at approximately 2 a.m. on December 6, Timothy Washburn was in the vicinity of the apartment building in which the victim lived, located near the DeLeon house. Washburn noticed a minivan turn into an alley and observed two men step in front of it, whereupon one of the men ordered the driver to " 'get out of the van' " and yanked the door open. Washburn stopped behind the minivan to watch the car-jacking. According to Washburn, once the door was open, one of the men used his elbow to force the driver out of the driver's seat and climbed into the minivan. The second man remained in front of the minivan and yelled, "[H]urry up. That dude is watching." The second man then ran to the other side of the minivan, but found the door was locked. Someone inside the minivan opened the door, and the second man climbed inside.

Washburn then saw the two men drive off with the original driver in the minivan; he called the 911 emergency service and waited for the police.

Washburn explained that the streetlights provided light, but the darkness could have obstructed his vision of the two men whom he described as black males. Brunzo is not black, but Washburn explained that in the dark and from a distance, he might mistake Brunzo for a black man.

Sometime after the gathering broke up, Huerta and Carrera left the DeLeon house to go to a nearby convenience store to call for a ride home. After using the telephone, Huerta and Carrera walked back to the house and saw a minivan down the street. Eona and Brunzo were inside the minivan; Eona was sitting in the driver's seat and Brunzo in the passenger's seat. Huerta and Carrera climbed into the minivan through the sliding side door. Huerta sat against a box in the back, and Carrera sat behind the driver's seat.

Mantich also wanted to get into the minivan, but Barrientos was holding onto his waist in an effort to prevent him from entering. Indeed, Barrientos and Mantich were arguing;

Barrientos was trying to persuade Mantich to go home with her. Mantich nonetheless entered the minivan and sat in the back next to Huerta.

Approximately 5 minutes after driving away, Huerta noticed the victim hunched over in the front of the minivan between the two front seats with his hands behind his head. After noticing the victim, Huerta began using the names of other street gangs by saying, " 'What's up, Cuz?' " and " 'What's up, Blood?' " to make the victim believe that the others were from a different gang.

Carrera also noticed the victim between the two front seats and saw Eona poke the victim with something that could have been Eona's gun. Eona continued driving for approximately 10 minutes, when a gunshot was fired inside the minivan. Huerta and Carrera both testified that they did not see who fired the gunshot. Huerta further testified that the victim was shot and that after a couple of minutes, Huerta saw the victim's body fall out of the minivan from the front passenger door.

Carrera testified that after the gunshot, Eona pulled the minivan over and stopped. Brunzo opened the front passenger door and pulled the body from the minivan, with a helping push from Eona. Eona then drove the minivan away, whereupon Carrera said, " 'Let me go get mine,' " referring to his gun. Eona drove to Carrera's house, and Carrera then got his gun and returned to the minivan. Once Carrera climbed into the minivan, Eona drove a "block or two" and stopped.

At approximately 2:44 a.m. on December 6, Carrera and Huerta shot at a house at which Nacho Palma resided. Palma was known to be a member of the rival street gang that was allegedly involved in the shooting of Campbell.

After the drive–by shooting at Palma's house, Eona drove the minivan from the scene, and discussion ensued about putting it in the river. Eona drove the minivan to the Missouri River; Eona, Brunzo, Mantich, Huerta, and Carrera then got out, and it rolled into the river. The group next walked away from the river through the woods. Mantich and Huerta took the guns from Brunzo, Eona, and Carrera and walked to Huerta's house to hide them. Huerta was tired, so Mantich left Huerta's house. Meanwhile, Eona, Brunzo, and Carrera returned to where the

victim's body lay. After walking past the body, they continued to Huerta's house, where they stayed for the remainder of the night.

Later on December 6, Huerta gave Carrera his gun, and Huerta left his house for a couple of hours. When he returned, no one else was there, so Huerta took the two remaining guns from his backyard and threw them into the Missouri River.

## 2. Investigation

Scott Petersen discovered a body in the street in front of his house when he left for work sometime between 3 and 3:20 a.m. on December 6. As his telephone was not working, he drove to work as fast as he could and called the 911 emergency service to report his finding.

In the meantime, at approximately 2:30 a.m., police officer Stephen Clouse had received a report of the drive–by shooting. While investigating that incident, he received another call concerning the body Petersen had found. Clouse then went to that location, which was approximately 1¹/₂ miles from the site of the drive–by shooting, where he arrived at approximately 3:30 a.m.

Residents of an area approximately four blocks from the site of the drive–by shooting had found vehicle license plates which proved to have come from a vehicle last known to be in the victim's possession. As a consequence, on December 7, 1993, Officer Keith Harris and Det. William R. Lindsey went to the area to conduct an investigation at this "secondary crime scene," where blood–soaked items were found.

On December 30, 1993, Officer William Agnew noticed Brunzo riding in an automobile, followed him, and stopped him. Agnew walked up to the vehicle, identified himself as a police officer, and informed Brunzo that he wanted to talk about the victim's murder. Brunzo said that he "would come to the police headquarters to be questioned." At this time Brunzo was not a suspect in the homicide investigation, and there was no warrant for his arrest.

Agnew and his partner drove Brunzo to police headquarters where Brunzo, Agnew, and Officer Virgil Patlan convened in an interview room. Agnew told Brunzo that the police had

interviewed several people concerning the murder. Brunzo said he was aware the police had interviewed Carrera and that Brunzo was not sure he could help. Agnew thereupon told Brunzo that Agnew had received information that Brunzo had been present at James Parsons' house for a party on December 5. Brunzo stated that it was not a party, but that he had gone to Parsons' house after being at DeLeon's house. Agnew asked Brunzo with whom he attended the DeLeon gathering, and Brunzo explained that his girl friend, Julie Janulewicz, dropped him off at DeLeon's house at about 8 p.m. on December 5. Brunzo also stated he traveled from the area of DeLeon's house to Parsons' house with Joe Mahea and Huerta in Mahea's automobile.

Brunzo denied being with Eona, and when asked about specific details concerning the DeLeon gathering, Brunzo asked whether he was a suspect in the investigation. Agnew replied that Brunzo was not, and Brunzo ultimately terminated the interview without saying anything more about the events in question. Agnew then drove Brunzo home.

The first attempt to locate the minivan in the Missouri River was made on January 3, 1994, and proved unsuccessful. However, on this occasion the police found a .32–caliber handgun and several keys which Blankenau identified as his copies of keys to businesses for which he had cleaning contracts.

The police made a second attempt to recover the minivan on May 31, 1994. This time, it was recovered and thereafter held in the police impound lot. At the lot, the minivan was searched for physical evidence by laboratory technician Karenina Smith, who found a 9–millimeter shell casing on the floorboard of the front passenger seat.

Daniel Bredow, another laboratory technician, determined that the spent casing recovered from the minivan was fired from the same weapon as the four 9–millimeter shell casings recovered from the scene of the drive–by shooting.

Dr. Robert Bowen, the pathologist who performed an autopsy on the victim's body on December 6, 1993, noted that there was a gunshot wound in the back of the head, contusions about the upper parts of the eyelids, abrasions along the back and along

the anterior part of the chest, and what appeared to be a shoe imprint on the side of the chest. Bowen also observed several circular bruises on the back and the top of the head, which were consistent with the victim's having been poked with the barrel of a gun. Bowen determined that the gunshot to the head caused instantaneous death.

### 3. TRIAL

Brunzo unsuccessfully moved to suppress the statements he had made to the police. At the hearing on the motion, Agnew revealed that he received information from Parsons, a self-proclaimed counselor who works with the Lomas gang, that Brunzo possibly had information regarding the victim's murder. He then testified essentially as he later did at trial, as summarized in the immediately preceding subpart of this opinion.

In addition, Brunzo unsuccessfully sought an order from the district court directing Huerta and Carrera to give deposition testimony. Brunzo then, on the ground that the two had asserted their Fifth Amendment right against self-incrimination and refused to answer any deposition questions, unsuccessfully moved to prohibit the State from calling Huerta and Carrera as witnesses.

After the jury was impaneled, the plaintiff–appellee State called Clouse as its first witness. Brunzo objected to testimony regarding this witness' response to a call concerning the drive–by shooting, characterizing this evidence as relating to a subsequent uncharged crime, and requested a hearing outside the presence of the jury concerning the matter. Although the district court overruled Brunzo's objection, Clouse thereafter testified only with regard to his involvement with the investigation at the site where the body was found.

Over Brunzo's objection, Harris testified concerning the items found at the secondary crime scene. It was then stipulated that the blood samples taken from that scene were of the same type as the victim's blood.

Over Brunzo's objection, Agnew testified as to his interview with Brunzo at police headquarters. Officer Felands Marion then testified about the recovery of the minivan from the

Missouri River.

The district court next held an in-chambers hearing to determine the admissibility of the testimony of Carrera and Huerta concerning the drive-by shooting. At this hearing, Carrera admitted that he had agreed to testify in exchange for the opportunity to plead to the lesser charge of second degree murder in the future and that he waived his right against self-incrimination to testify in court. Carrera testified that he wanted to shoot someone in retaliation for Campbell's murder. He further testified that he had told Eona that he wanted a "G-ride" and that Eona, who was holding a gun, said that he wanted to "jack somebody." Carrera further testified that he later saw Eona and Brunzo in an unfamiliar minivan which he entered. Carrera then testified about the gunshot in the minivan and his participation in the drive-by shooting, stating that Eona was driving the minivan and that Brunzo was present during the drive-by shooting.

Huerta then testified, admitting to a plea arrangement and to having waived his right against self-incrimination. Huerta testified that he talked to Mantich about doing a drive-by shooting and that it was normal to use a stolen vehicle to do such. He also admitted that he anticipated doing a drive-by shooting when he entered the minivan; that he shot at the house in question; and that he was then under the influence of LSD, marijuana, and alcohol.

The district court determined that there was insufficient evidence to show that Brunzo committed the drive-by shooting and, therefore, concluded that the evidence was admissible only as to Eona and that Brunzo could request a cautionary instruction concerning the matter. Brunzo unsuccessfully moved for a separate trial.

Over Brunzo's objection, Huerta then testified before the jury essentially as he had at the in-chambers hearing. Upon Brunzo's request, a cautionary instruction was given whenever testimony concerning the drive-by shooting was adduced. Next, the deposition testimony of Washburn was read into evidence.

Thereafter, Carrera testified before the jury essentially as he had at the in-chambers hearing, adding, however, that he had assisted the police in locating the minivan in the river. Again at

Brunzo's request, the district court cautioned the jury that the drive-by shooting evidence was admissible only as to Eona. Prior to cross-examining Carrera, Brunzo renewed his objections to Carrera's testimony, arguing that he had been denied the right to properly prepare for cross-examination because Carrera's trial testimony was the first time he had learned of Carrera's involvement with the police investigation. Arguing that Carrera's testimony at trial varied from that given during the hearing in chambers, Brunzo then unsuccessfully moved for a mistrial.

John Lujano, a resident of the house that was the target of the drive-by shooting, testified as to the time of the shooting, and the district court again gave the jury the cautionary instruction relating to the evidence being admitted only with respect to Eona. Officer Louis Briganti then testified as to the shell casings recovered from the site of the drive-by shooting, and the jury was again cautioned as to the limited admissibility of that evidence.

Smith testified about the physical evidence recovered from the minivan, including the shell casing, and Bredow testified as to the caliber of weapon that fired the bullets into the house during the drive-by shooting. Again, the jury was reminded of the earlier cautionary instruction regarding the limited admissibility of the drive-by shooting evidence.

## IV. ANALYSIS

With the foregoing summary of the facts and applicable scopes of review in mind, we turn our attention to the assignments of error.

### 1. SUPPRESSION OF STATEMENTS

In the first assignment of error, Brunzo claims that the district court erred by overruling his motion in limine and subsequent objections to Agnew's testimony regarding the statements he made while being questioned at police headquarters.

We note first of all that Brunzo does not tell us what he claims injures him in the statements he made; he merely argues that as he was in custody, his statements were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.

Ed. 2d 694 (1966), and were thus inadmissible.

*Miranda* prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). For purposes of the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement officers after one has been taken into custody or is otherwise deprived of one's freedom of action in any significant way. *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Bronson, supra*.

In *Mathiason*, the defendant went to the police station on his own accord in response to a note that a police officer had left for him at his residence indicating that the officer wanted to discuss something with him. The officer told the defendant that he was not under arrest, but that the officer believed the defendant had been involved in a specific burglary. After the officer falsely stated that the defendant's fingerprints had been found at the scene, and within 5 minutes after arriving at the station, the defendant confessed to the burglary. The officer then read the defendant his *Miranda* warnings and obtained a taped confession.

The *Mathiason* Court found that a noncustodial situation is not converted to one in which the *Miranda* rule applies simply because a reviewing court concludes that even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment. Police officers are not required to administer *Miranda* warnings to everyone whom they question, or simply because the questioning takes place in a police station, or because the questioned person is one whom the police suspect. *Bronson, supra*. Rather, *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." *Bronson, supra*.

One is in custody for *Miranda* purposes when there is a formal arrest or a restraint on one's freedom of movement of the degree associated with such an arrest. *Bronson, supra*; *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), *cert. denied* 498

U.S. 1127, 111 S. Ct. 1091, 112 L. Ed. 2d 1195 (1991). Determinations as to whether one has been seized in this context are questions of fact. *Id.* The question of whether one's consent to accompany law enforcement officials was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined under all the circumstances. *Bronson, supra.*

Brunzo seizes upon the district court's observation that the "finger of suspicion" had not yet focused upon him and argues therefrom that the district court used a subjective rather than an objective test to determine that Brunzo was not in custody.

In *Stansbury v. California*, ____ U.S. ____, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994), the Court stated that a police officer's knowledge or beliefs on the issue of custody, if conveyed by word or deed to the individual being questioned, are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of one's "freedom of action." See *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). The *Stansbury* Court noted that even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue; for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation or the officer's beliefs concerning potential culpability of the individual being questioned may be one among many factors that bear upon the assessment of whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive one's freedom to leave. *Stansbury, supra.* The Court emphasized that it is the objective surroundings and not any undisclosed views that control the *Miranda* custody inquiry.

In *Stansbury*, the Court reversed the California Supreme Court's decision admitting the defendant's statements because

its analysis focused on the officers' subjective beliefs regarding the defendant's status as a suspect as significant in and of themselves, rather than as relevant only to the extent they influenced the objective conditions surrounding his interrogations. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury, supra.*

The defendant in *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), and his stepbrother attempted to steal hashish from an individual who resisted. The stepbrother killed the individual, and the defendant called the police and told them what had happened. The defendant voluntarily accompanied the police to the police station and was told that he was not under arrest. The defendant talked about the murder with the officers, but was not advised of his *Miranda* rights. He was permitted to leave, pending the district attorney's decision as to what charges to file, and 5 days later was arrested for aiding and abetting the murder. The U.S. Supreme Court held that *Miranda* warnings are not required if a suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by the police after a brief interview. The Court also stated the fact that a person who voluntarily engages in an interview with police is unaware of the consequences of his participation does not transform a voluntary interview into a custodial one so as to require *Miranda* warnings. The warnings specified in *Miranda* are required only when there has been a restriction on a person's freedom so as to render such person in custody.

Similarly, the defendant in *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993), had explicitly been told that he was not under arrest, but that the officers wanted to discuss further at the police station the matter of a murder investigation. The officers testified that the defendant appeared calm, composed, and cooperative and agreed to accompany them to the station. He was escorted to the station by officers without handcuffs in an unmarked detective's police vehicle, during which time the men talked about the defendant's job, background, and family. Although the defendant asserted that he did not feel he had a

choice, he was held to have voluntarily accompanied the officers to the station. We concluded the evidence indicated that despite the fact that the defendant was interrogated in "privacy" and in "unfamiliar surroundings," factors on which *Miranda* placed great stress, considered in light of all the circumstances, the interrogation clearly did not rise to the level defined by the U.S. Supreme Court to be custodial interrogation.

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984), the Court held that the initial traffic stop of a motorist's vehicle, by itself, did not render the motorist "in custody" for purposes of *Miranda* when there was no evidence that the motorist was subject to restraints comparable to those associated with a formal arrest. Therefore, the fact that the police effected a traffic stop to ask Brunzo to accompany them for questioning does not, in and of itself, provide conclusive evidence that Brunzo was in custody for purposes of *Miranda*.

Brunzo voluntarily accompanied the officers to police headquarters after the officers recognized him and stopped the vehicle in which he was a passenger. Brunzo was told that he was not a suspect and that he was not under arrest. Once at headquarters, Brunzo was allowed to leave the interview room. The interview concluded upon Brunzo's request, whereupon the officers drove him to his house. Under the circumstances, it cannot be said that Brunzo was deprived of his freedom in any significant way so as to characterize the police interview as "custodial interrogation" for purposes of *Miranda*. Thus, this assignment of error is meritless.

### 2. Discovery and Related Testimony

That determination brings us to the second assignment of error, in which Brunzo urges that because the district court wrongly refused to compel Carrera and Huerta to present themselves to be deposed, the district court incorrectly permitted them to testify.

More specifically, Brunzo urges that as the police reports indicated that due to his physical and mental condition at the time he made statements to the police, Huerta would not be competent to testify, the fact that the State intended to use his testimony suggested that something had changed. Brunzo then

postulates that he had a right to discover by deposition what Huerta's testimony would be.

Brunzo further claims that it was not until Carrera testified at trial that Brunzo learned of Carrera's involvement with the police in locating the minivan. He argues that the district court should have ordered Carrera and Huerta to waive their Fifth Amendment privilege and compel their deposition testimony or should have prohibited the State from calling Huerta and Carrera as witnesses.

However, the legal reality is that absent a motion by the county attorney or other prosecuting attorney, a trial court lacks authority to grant immunity and order a witness to testify. Neb. Rev. Stat. § 29-2011.02 (Cum. Supp. 1994); *State v. Starks*, 229 Neb. 482, 427 N.W.2d 297 (1988).

In *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993), we held that in order to prevent the possible enhancement of a sentence, one who has pled guilty but who is awaiting sentence may invoke the privilege against self-incrimination. It thus necessarily follows that a witness awaiting trial may invoke that privilege.

Under the circumstances, neither does the fact that Carrera and Huerta invoked their privilege against self-incrimination at their scheduled depositions mean that the State could not call them as witnesses at trial once they elected to testify. Not only does Brunzo not articulate how earlier knowledge of the trial testimony Carrera and Huerta gave would have assisted in the preparation of his defense, he made no motion for a continuance, after he learned that they would testify, so that he could depose them.

Thus, this assignment of error is also meritless.

### 3. SEPARATE TRIAL OR MISTRIAL

In the third assignment of error, Brunzo urges that because the evidence concerning the drive-by shooting was admissible only as to Eona, the district court erred by not severing the trials or declaring a mistrial, as its cautionary instruction that the evidence was to be used against Eona only could not overcome the prejudicial effect of the evidence.

The argument rests on Neb. Evid. R. 404, Neb. Rev. Stat.

§ 27-404 (Cum. Supp. 1994), which in relevant part reads:

    (2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

    (3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

First of all, Brunzo argues that the hearing granted him by § 27-404(3) was not timely because it was not held until after trial commenced. The statute does not specify that the hearing must occur prior to trial; it only provides that the proof shall first be made outside the presence of the jury. The district court held the hearing before any testimony of the drive-by shooting was admitted, with the exception of Clouse's statement that he had responded to a call and arrived at the site of a drive-by shooting. Since Clouse was the first witness, the jury did not know at that time of the connection between the robbery and kidnapping and the subsequent drive-by shooting. Brunzo's argument that it was error to have delayed the hearing is without substance.

There is no constitutional right to a separate trial. The right is statutory, as set out in Neb. Rev. Stat. § 29-2002 (Cum. Supp. 1994), and depends upon a showing that prejudice will result from a joint trial. *State v. Clark*, 228 Neb. 599, 423 N.W.2d 471 (1988); *State v. Clark*, 189 Neb. 109, 201 N.W.2d 205 (1972). A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *State v. Illig*, 237 Neb. 598, 467 N.W.2d 375 (1991). Whether separate trials are required depends upon a showing by a defendant that prejudice will result from the joint trial. *Id*. The propriety of a joint trial involves two questions: whether the consolidation is proper

because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial. *State v. Brehmer*, 211 Neb. 29, 317 N.W.2d 885 (1982). The burden is on the party challenging the joint trial to demonstrate how and in what manner he or she was prejudiced. *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989).

Although the joinder statute has changed since this court's decision in *Brehmer*, the analysis is similar in that § 29–2002 still requires a trial court to first examine whether joinder was proper, and if it was, then to consider whether there was a right to severance because of prejudice. Section 29–2002 states that the court may order two or more informations to be tried together if the defendants are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. It is well settled that criminal actions may be consolidated for trial if the offenses charged are based on the same act or transaction. *Brehmer, supra*.

Here, the information against Brunzo and Eona charged both of them with first degree murder and the use of a firearm to commit a felony. While neither was found guilty of the firearm charge, the conduct upon which each of the charges was based was part of a factually related transaction or series of events in which both Brunzo and Eona participated. Although the district court subsequently found the evidence insufficient to support Brunzo's participation in the drive–by shooting, both were charged for their conduct involving the robbery and kidnapping, and the evidence of the drive–by shooting was admissible to prove Eona's motive.

While Brunzo urges that the district court's cautionary instruction did not overcome the prejudice of the evidence, he fails to articulate what that prejudice was. It must be remembered that there was both direct and circumstantial evidence that Brunzo at least aided and abetted stealing the minivan and abducting the victim. There was also direct evidence that Brunzo was present in the minivan when the

victim was shot. Furthermore, there is direct evidence that Brunzo dragged the body from the minivan. In light of all the evidence implicating Brunzo in the underlying robbery or kidnapping, it is difficult to imagine how evidence that a subsequent drive-by shooting occurred prejudiced him.

Consequently, this assignment of error is without merit as well.

### 4. SUFFICIENCY OF EVIDENCE

In the fourth assignment of error, Brunzo argues that as there was no evidence that he was the principal actor, he must have been convicted as an aider and abettor and that the evidence falls short of establishing even such attempted participation in a felony murder. More specifically, Brunzo urges that the evidence fails to establish that he knew the principal actor had the requisite intent or that Brunzo himself had such intent.

First of all, the argument overlooks that in *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994), we reaffirmed that the common-law distinction between a principal and an aider and abettor has been abolished. See, *State v. Thomas*, 210 Neb. 298, 314 N.W.2d 15 (1981); *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972), *cert. denied* 430 U.S. 947, 97 S. Ct. 1584, 51 L. Ed. 2d 795 (1977). Neb. Rev. Stat. § 28-206 (Reissue 1989) provides that one "who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed. No particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. Mere encouragement or assistance is sufficient. *State v. Sanders*, 241 Neb. 687, 490 N.W.2d 211 (1992); *State v. Bennett*, 219 Neb. 601, 365 N.W.2d 423 (1985); *State v. True*, 210 Neb. 701, 316 N.W.2d 623 (1982).

However, when a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that

the aider and abettor himself or herself possessed such. *Secret, supra*; *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992); *State v. Dittrich*, 191 Neb. 475, 215 N.W.2d 637 (1974). An aider and abettor can be convicted of any crime, even a greater offense than the principal, provided the conviction is supported by the evidence of the facts and the defendant's state of mind. *Secret, supra*; *Thomas, supra*.

One who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act. *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993); *Carter, supra*; *State v. Trackwell*, 235 Neb. 845, 458 N.W.2d 181 (1990).

Intent to kill is not an element of felony murder. *State v. Kauffman*, 183 Neb. 817, 164 N.W.2d 469 (1969), *disapproved on other grounds, State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982). The intent required is the intent to commit the underlying felony. *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372; *Bradley, supra*.

The facts taken in the light most favorable to the State are such that a finder of fact could conclude beyond a reasonable doubt that Eona and Brunzo had guns at the DeLeon gathering when Eona stated that he wanted to "jack somebody."

The record further contains evidence that two men stepped in front of a minivan and that one used force to move the driver in the minivan. The other entered the minivan from the passenger side, and the two men drove away with the original driver. Eona and Brunzo reappeared in the area of the DeLeon gathering in an unfamiliar minivan with a man kneeling between the two front seats with his hands behind his head. Eona was poking the victim in the head with something. The pathologist testified that the injuries to the victim's head were consistent with being poked with the barrel of a gun.

The record further supports a finding that a gunshot was fired in the minivan and that Brunzo dragged the body from the minivan, leaving it in the street, and reentered the minivan to leave with Eona.

In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993); *State v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993).

The circumstantial evidence regarding the car–jacking and the direct evidence of Brunzo's presence in the minivan during the victim's murder and his disposal of the body, taken together, support the conclusion that Brunzo had the requisite intent to commit at least a robbery or knew that Eona had the intent to commit a robbery when they both stepped out in front of the minivan to stop it. In addition, the fact that Eona was driving the minivan and that Brunzo remained in the passenger seat supports a finding that Brunzo was the person who entered the passenger side of the minivan after Eona used force to take the minivan from the driver. Therefore, a fact finder could well conclude beyond a reasonable doubt that Brunzo had the intent to commit either a robbery or a kidnapping when he entered the minivan.

Thus, this assignment of error too is without merit.

## 5. Jury Instructions

In the fifth and last assignment of error, Brunzo asserts that he was prejudiced by the failure of the district court's instructions to properly state the law with respect to aiders and abettors and the material elements of felony murder.

Robbery and kidnapping require a particular intent. Neb. Rev. Stat. § 28–324 (Reissue 1989) provides: "(1) A person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another

any money or personal property of any value whatever. (2) Robbery is a Class II felony."

Neb. Rev. Stat. § 28-313 (Reissue 1989) provides:

(1) A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to do the following:

(a) Hold him for ransom or reward; or

(b) Use him as a shield or hostage; or

(c) Terrorize him or a third person; or

(d) Commit a felony; or

(e) Interfere with the performance of any government or political function.

(2) Except as provided in subsection (3) of this section, kidnapping is a Class IA felony.

(3) If the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury, prior to trial, kidnapping is a Class II felony.

Therefore, as developed in the immediately preceding subpart of this opinion, an alleged aider and abettor can be held criminally liable as a principal to a robbery or kidnapping if it is shown that the aider and abettor knew that the perpetrator of the robbery or kidnapping possessed the required intent or that the aider and abettor himself or herself possessed the required intent.

With regard to felony murder, the district court first instructed the jury that depending on evidence it found that the State has proved beyond a reasonable doubt, it might find Brunzo

(1) Guilty of Murder in the First Degree in that . . . Brunzo, either alone or while aiding and abetting another person, killed [the victim] in the perpetration of, or attempt to perpetrate a robbery or kidnapping; or

(2) Not Guilty.

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict . . . Brunzo of the crime of Murder in the First Degree while in the perpetration of, or attempt to perpetrate a robbery or kidnapping are:

(1) That on or about the 6th day of December, 1993, . . . Brunzo, either alone or while aiding and abetting another person, did kill [the victim] . . . .

(2) That . . . Brunzo, either alone or while aiding and abetting another person, killed [the victim] while . . . Brunzo was:

a) Perpetrating a robbery upon [the victim], to wit: did forcibly and by violence, or by putting in fear, take from the person of [the victim] money or personal property of any value whatsoever either owned by or under the personal protection of [the victim] with the intent to steal, or

b) Attempting to perpetrate a robbery upon [the victim] by engaging in conduct, which, under the circumstances as . . . Brunzo believed them to be, constituted a substantial step in a course of conduct intended by . . . Brunzo to culminate in the crime of robbery, to wit: did forcibly and by violence, or by putting in fear, take from the person of [the victim] money or personal property of any value whatsoever either owned by or under the personal protection of [the victim] with the intent to steal, or

c) Perpetrating a kidnapping upon [the victim], to wit: did abduct [the victim], or having abducted him, continued to restrain him with the intent to terrorize him, or

d) Attempting to perpetrate a kidnapping upon [the victim] by engaging in conduct, which, under the circumstances as . . . Brunzo believed them to be, constituted a substantial step in a course of conduct intended by . . . Brunzo to culminate in the crime of kidnapping, to wit: did abduct [the victim], or having abducted him, continued to restrain him with the intent to terrorize him.

The district court also instructed the jury:

Criminal intent is a material and necessary element of the crime of Murder in the First Degree in the commission of a felony as charged against each defendant. But the intent required is not an intent to kill [the victim] but is an intent to commit a robbery or kidnapping.

The intent required by [other instructions] is a material

element of the crime charged against each defendant. Intent is a mental process, and it therefore generally remains hidden within the mind where it is conceived. It is rarely —if ever— susceptible of proof by direct evidence. It may, however, be inferred from the words and acts of each defendant and from the facts and circumstances surrounding his conduct. It is for you to determine from all the facts and circumstances in evidence whether or not each defendant committed the acts complained of and whether at such time he had the criminal intent required by [other instructions]. If you have any reasonable doubt with respect to either, you must find that defendant not guilty.

With respect to the matter of aiding and abetting, the district court instructed the jury:

To be guilty of the crime charged, it is not necessary that the State prove that the defendant himself committed the unlawful act or acts in question.

Whoever aids, abets, or procures another to commit any offense may be prosecuted and punished as if he were the principal offender.

If you find from the evidence beyond a reasonable doubt that the unlawful act or acts in question were committed by another person who was:

1. Engaged by the defendant to commit the unlawful act or acts; or

2. Engaged with the defendant in a common, concerted, unlawful act or acts; or

3. Incited or encouraged by the defendant to commit the unlawful act or acts,

then the defendant is as guilty as if he himself committed the unlawful act or acts, and it is your duty to find the defendant guilty.

Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary; nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. Mere encouragement or assistance is sufficient.

On the other hand, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving the defendant guilty.

The applicable rule is that jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20 (1985). The questioned instructions, read together and taken as a whole, fairly present the law regarding felony murder and an aider and abettor's criminal liability as a principal. Under those circumstances, that they use words different than those Brunzo tendered is immaterial.

Although we have suggested that whenever an instruction contained in the Nebraska Jury Instructions is applicable and, from a consideration of the facts and prevailing law, the trial court determines that an instruction on a particular subject is appropriate, the instruction in the Nebraska Jury Instructions should be used, as a general matter a trial court retains discretion in the wording of jury instructions. *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992). Cf. *State v. Bartholomew*, 212 Neb. 270, 322 N.W.2d 432 (1982) (whenever instruction in Nebraska Jury Instructions is applicable, that instruction shall be used).

In the final analysis, a trial court's obligation is to instruct correctly. So long as that is done, the source of its language is unimportant.

Inasmuch as the instructions given properly reflect the law, this assignment of error is as meritless as those preceding it.

## V. JUDGMENT

Because the record fails to sustain any assignment of error, the judgment of the district court, as first noted in part I, must be and hereby is affirmed.

AFFIRMED.