STATE OF NEBRASKA, APPELLEE,
V. THOMAS FREEMAN, APPELLANT.
571 N.W. 2d 276

Filed December 5, 1997.    No. S-95-1027.

Thomas M. Kenney, Douglas County Public Defender, and Gary D. Olson for appellant.

Don Stenberg, Attorney General; James S. Jansen, Douglas County Attorney; and Donald W. Kleine, Chief Deputy County Attorney and Special Assistant Attorney General, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, and STEPHAN, JJ.

WRIGHT, J.

Thomas Freeman was convicted of eight counts of first degree sexual assault and four counts of use of a weapon to commit a felony. The Nebraska Court of Appeals affirmed the convictions and sentences, and we granted Freeman's request for further review.

## I. SCOPE OF REVIEW

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997); *State v. McCleery*, 251 Neb. 940, 560 N.W.2d 789 (1997); *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact; a conviction will be affirmed in the absence of prejudicial error if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Severin,* 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Newman,* 250 Neb. 226, 548 N.W.2d 739 (1996).

A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *State v. Brunzo,* 248 Neb. 176, 532 N.W.2d 296 (1995).

Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2) and 403, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Eona,* 248 Neb. 318, 534 N.W.2d 323 (1995); *State v. Williams,* 247 Neb. 878, 530 N.W.2d 904 (1995).

## II. FACTS

### 1. Eight Sexual Assaults

Following is a factual summary of the eight sexual assaults which are the subject of this appeal. The assaults occurred in Omaha, Nebraska, between March 31 and August 24, 1993.

### (a) Assault No. 1

At 11:30 p.m. on March 31, 1993, Victim 1 was entering her apartment building in the 2400 block of North 94th Plaza. She was grabbed from behind by a man who covered her face with his hand and carried her around the building. Victim 1 was threatened a number of times and told not to make any noise or she would be killed. She was placed on the ground, and her jacket was pulled over her head so that she could not see. During the assault, the assailant attempted vaginal penetration, but apparently, he did not have an erection. During the assault, the man tried to kiss her and said, "Give me some tongue."

Victim 1 did not see the man's face, but saw his neck and described his skin as being black. Also, from the sound of his voice, the victim believed the assailant to be an African-American man. Freeman was subsequently charged with sexual assault in the first degree (count I).

### (b) Assault No. 2

On April 4, 1993, while driving home prior to the assault, Victim 2 noticed an African-American man jogging near her apartment. He was wearing a dark, hooded sweatshirt. Between midnight and 1 a.m., Victim 2 was attacked from behind on the stairs outside her apartment building located in the 4800 block of Dodge Street. The assailant covered her mouth, raised a knife in front of her face, and repeatedly told her to shut up or he would kill her. The man told her that he did not want her to see his face, and he made her pull her coat over her head. Victim 2 was asked where her boyfriend was and if anyone was in her apartment. He forced her to enter her apartment. Once inside, she was forced to take off her clothes, and then the man attempted to penetrate her.

Initially, the assailant did not have an erection, but he eventually penetrated her. During the assault, he attempted to kiss Victim 2 and told her to give him her tongue. The assailant performed cunnilingus on the victim and penetrated her again. Then, the assailant tied a rag around the victim's face and penetrated her a third time. Victim 2 was forced into the bathtub and told to wash the "cum" out of her genitals. While the victim was washing, the assailant went through dresser drawers in the bedroom. When the assailant returned to the bathroom, he made her wash her genitals again while he watched. Victim 2 testified that the assailant had a "black male's voice." Freeman was charged with sexual assault in the first degree (count II) and use of a knife to commit a felony (count III).

### (c) Assault No. 3

About 4 a.m. on April 11, 1993, Victim 3 was lying in her bed with the television on in her home located in the 100 block of South 68th Street. She heard a loud crash, and then a man appeared in her doorway. He was pointing what appeared to be a gun at her. The man told her not to look at him and warned her

that if she did not cooperate, he would kill her. Victim 3 was asked if anyone else was in the house, was blindfolded with a pillowcase, and then was sexually assaulted. During the assault, the man tried to kiss her and repeatedly told her, "Give me that tongue." The assailant asked her sexually oriented questions, including whether she was a virgin. He also performed cunnilingus on the victim, and after penetrating her, he then ordered her to stay in bed while he rummaged through the house. Before leaving, he forced her into the bathroom and made her wash her genitals. She believed her assailant was 6 feet 1 inch or 6 feet 2 inches tall and that his voice was that of an African-American man. Freeman was charged with sexual assault in the first degree (count IV) and use of a firearm to commit a felony (count V).

### (d) Assault No. 4

At 1 a.m. on August 1, 1993, Victim 4 was attacked as she attempted to start her station wagon outside a video store located at 50th and Capitol Avenue. The assailant had dark hair and was wearing a Halloween mask. He opened the driver's-side door and pushed her over to the passenger's side. He held a knife to Victim 4's throat, covered her mouth, and told her he would kill her if she screamed. The assailant made Victim 4 climb onto the floor of the passenger side of the car and kept her head down with his hand. As he drove away from the video store, he stated that he needed to go to Kansas City and asked her how much money she had.

Victim 4 told him she did not have very much money with her but that she could retrieve some money from an automated teller machine. While keeping the victim's head pushed down, he asked her several personal questions, including whether she had a boyfriend and whether she was a virgin.

Eventually, the assailant stopped the car and sexually assaulted Victim 4. He instructed the victim to put a pillow that she had in the car over her face and repeatedly told her that he did not want her to see him. She recalled that the man did not initially have an erection and that he ordered her to masturbate him until he became erect. At one point, he raised his mask halfway up his face, asked her to kiss him, and complained that

she was not giving him any tongue. The victim was sexually assaulted vaginally and anally.

Her attacker wore a mask, jeans, black gloves, and a dark, hooded sweatshirt. She believed his voice was that of an African-American man. Victim 4 briefly saw her attacker's eyes and could tell that he was African-American. After the assault, Victim 4 was instructed to count to 100 before attempting to leave. Freeman was charged with sexual assault in the first degree (count VIII) and use of a knife to commit a felony (count IX).

### (e) Assault No. 5

Sometime after 10:30 p.m. on August 5, 1993, Victim 5 was awakened by a man who entered a second-floor window of her apartment near the 3300 block of North 105th Plaza. She was forced to put her face in a pillow, and the assailant demanded money. He then tied a pillowcase around her eyes and told her to retrieve the money. She was asked sexually oriented questions and then sexually assaulted.

Victim 5 testified that the man did not initially have an erection and rubbed himself against her body until he obtained one. After penetrating her vaginally, he attempted to kiss her, saying something like "[g]ive me your tongue" or "[g]ive me the tongue." He then penetrated her anally, performed cunnilingus on her, and then penetrated her vaginally again. He forced her into the bathroom and made her wash her genitals while still blindfolded.

While Victim 5 was in the bathroom, she could hear the man going through the kitchen cabinets. He threatened that if she called the police, he would kill her. As he left, he instructed her to count to 500 slowly before leaving the bathroom.

Victim 5 could not see the man during the assault, but heard a plastic sound that sounded like a mask or gloves. Based upon the man's speech, she believed her assailant was African-American. Freeman was charged with sexual assault in the first degree (count X).

### (f) Assault No. 6

Victim 6 was assaulted around 4 a.m. on August 8, 1993, at her home located in the 7000 block of Wirt Street. While in her bed talking on the telephone, an African-American man ran

from her living room into her bedroom wielding a knife. She was ordered not to look at him, and he said, "Shut up or I'll kill you." Placing a pillow over the victim's face and a knife to her neck, the assailant demanded money. She was then blindfolded with a pillowcase and sexually assaulted. The man had difficulty achieving an erection and rubbed himself against the victim until he obtained one. After he had penetrated her, the victim was told to wash her genitals in the bathtub. While she was in the bathtub, she heard the man moving things around the room in search of something. Freeman was charged with sexual assault in the first degree (count XI) and use of a knife to commit a felony (count XII).

### (g) Assault No. 7

Victim 7 was attacked about 8:05 a.m. on August 20, 1993, in a hallway outside her apartment in the 4700 block of Chicago Street. Approaching from behind, the assailant put a knife to her throat and told her to shut up or he would kill her. The victim was forced into her apartment, where he demanded money. The assailant attempted to tie a pillowcase around the victim's eyes. When he discovered that it was too short, he tied a bathrobe around her eyes instead. The assailant did not initially have an erection, so he forced the victim to perform fellatio on him until he became erect. During the sexual assault, the man instructed the victim to kiss him and "use her tongue." After the assault, the victim was forced to wash her genitals while still blindfolded. About 10 seconds prior to the attack, the victim had passed a tall African-American man in the hallway of her apartment building.

Victim 7 stated that her assailant was wearing work gloves and dark sweat clothes. She believed he was probably wearing navy sweat pants, a gray sweatshirt, and a red cap with a dark bill. She recalled that her assailant had black skin and estimated that he was 6 feet 3 inches or 6 feet 4 inches tall. Freeman was charged with sexual assault in the first degree (count XIII) and use of a knife to commit a felony (count XIV).

### (h) Assault No. 8

Victim 8 was awakened about 4 a.m. on August 24, 1993, in her apartment in the 9400 block of Western Plaza by a man who

placed his hand over her mouth. She was told that he had a knife and that if she screamed, he would hurt her. He placed a pillow over her head and demanded money, telling her that he had to go to Kansas City. The assailant took the victim's nightgown and tied it around her eyes as a blindfold. When she attempted to escape, she was struck in the head four times and once in the stomach.

Initially, the man did not have an erection, so he rubbed himself against the victim's body until he became erect. Victim 8 recalled that the man had a mask that had been pushed up on top of his head and that he demanded that she kiss him. When she refused, he forcibly kissed her. She was then penetrated vaginally, forced into the bathroom with the blindfold on, and told to take a hot shower.

Victim 8 testified that her assailant was African-American. She reported that he wore gloves with the fingers cut off. She testified that 4 days prior to the assault, two men had delivered furniture to her home and that she had told the men that she lived alone. Evidence was introduced to prove that Freeman was one of the men who had delivered furniture to her home. Freeman was charged with sexual assault in the first degree (count XV).

### 2. INVESTIGATION OF FREEMAN

On September 7, 1993, a Federal Bureau of Investigation (FBI) special agent and an Omaha police officer from the robbery and sexual assault unit contacted Freeman, an African-American, at his apartment at 1503 North 48th Street and requested the voluntary submittal of blood samples. Freeman refused to submit to any tests, and when the officers returned with a court order, Freeman had fled. Freeman was subsequently found and arrested in Colorado Springs, Colorado, on October 5.

In February 1994, while Freeman was jailed in the Douglas County Correctional Center, he was served with a court order requiring him to give blood and saliva samples. An Omaha police officer testified that Freeman stated: "I'm not going to give you any; and if you take it from me, it isn't going to be easy." Freeman was subsequently restrained, and blood was drawn.

All eight sexual assault victims were treated at local hospitals, where "rape kits" were prepared. The rape kits, which included vaginal swabs and a sample of Freeman's blood, were sent to the FBI laboratory for restriction fragment length polymorphism (RFLP) DNA analysis. The FBI lab compared semen stains taken from each of the victims with the blood sample taken from Freeman.

Audrey Lynch of the FBI DNA analysis unit testified that upon analysis, the DNA from Freeman's blood matched the DNA in the samples taken from the victims. Lynch concluded that the probability of randomly selecting an unrelated individual from the African-American population who would have had the same DNA profile as the profile of Freeman was 1 in 6 million for seven of the cases. Lynch testified that with respect to the eighth victim, the probability ratio was different, 1 in only 300, because fewer "loci matches" were compared (further explanation is given in section IV below).

On June 24, 1994, Freeman was charged by information with eight counts of first degree sexual assault and six counts of use of a weapon to commit a felony. The jury subsequently convicted Freeman on all eight counts of first degree sexual assault and four counts of use of a weapon to commit a felony. The trial court sentenced Freeman to 10 to 20 years' imprisonment on count I, 10 to 20 years' imprisonment on count II, 5 to 10 years' imprisonment on count III, 10 to 20 years' imprisonment on count IV, 10 to 20 years' imprisonment on count VI (previously count VIII), 5 to 10 years' imprisonment on count VII (previously count IX), 10 to 20 years' imprisonment on count VIII (previously count X), 10 to 20 years' imprisonment on count IX (previously count XI), 5 to 10 years' imprisonment on count X (previously count XII), 10 to 20 years' imprisonment on count XI (previously count XIII), 5 to 10 years' imprisonment on count XII (previously count XIV), and 10 to 20 years' imprisonment on count XIII (previously count XV). Each of these sentences was to be served consecutively to the others and to any other sentence previously imposed, with no credit for time in custody by reason of the fact that in October 1993 Freeman's parole was revoked and he began serving a life sentence.

### 3. PRIOR ATTEMPTED SEXUAL ASSAULTS

On February 13, 1995, after a consolidated trial, Freeman was convicted of two counts of attempted first degree sexual assault and one count of use of a deadly weapon to commit a felony. Freeman was sentenced to 6⅔ to 20 years' imprisonment on each count. The sentences were to be served consecutively to each other and to any other sentence he was serving at the time. The convictions and sentences were affirmed by the Court of Appeals in *State v. Freeman*, 96 NCA No. 9, cases Nos. A-95-365 and A-95-366 (not designated for permanent publication).

The first of these attempted sexual assaults occurred after 10 p.m. on March 28, 1993. The victim, L.T., was returning home. She pulled into her garage and got out of the car. As she was attempting to retrieve some groceries from the front passenger side of the car, a man pushed her back into the car and held her down. He told her to stop screaming or he would kill her. He then told her to close her eyes and pulled her sweater over her head. He then unhooked her bra and pulled her tights and underwear to her knees. A neighbor who heard L.T.'s screams came to investigate and saw a man jump the fence adjacent to the garage where the attack took place.

Upon subsequent investigation, crime lab technicians for the Omaha Police Division lifted two latent prints that contained two separate fingerprints and a palm print from the metal doorpost on the passenger side of L.T.'s vehicle. The crime lab technicians testified that these latent prints matched the fingerprints and palm prints of Freeman.

The second attempted sexual assault occurred on July 22, 1993, when the victim, L.P., was walking to her apartment building from a parking lot. She noticed a man running toward her, who then pinned her to the ground and lay on top of her. He displayed a knife and told L.P. that if she did not shut up, he was going to kill her. He told her that she was going to go with him. Two witnesses scared the attacker, who fled. One of the witnesses, T.B., later identified Freeman in an October 8 police lineup.

### 4. APPELLATE PROCEEDINGS

In the Court of Appeals, Freeman assigned the following errors: The trial court erred (1) in denying his motion to sever

the eight first degree sexual assault charges and their accompanying use of a weapon in the commission of a felony charges, (2) in admitting testimony of witnesses concerning an "uncharged" incident, (3) in denying his motion to suppress the DNA evidence, (4) in denying his motion in limine and allowing testimony concerning RFLP DNA statistical results and testing, (5) in failing to dismiss all counts due to insufficient evidence, and (6) in imposing excessive sentences.

The Court of Appeals affirmed the judgment of the trial court, see *State v. Freeman*, 96 NCA No. 41, case No. A-95-1027 (not designated for permanent publication), and we granted Freeman's request for further review.

### III. ASSIGNMENTS OF ERROR

Summarized and restated, in his petition for further review, Freeman assigns the following errors: The Court of Appeals erred (1) in not finding plain error in that the trial court should have severed the eight first degree sexual assault charges and the use of a weapon in the commission of a felony charges associated with the assaults; (2) in not finding that the trial court erred in permitting the State to admit at trial the testimony of L.P. and T.B. regarding evidence related to previous attempted sexual assaults, in violation of Neb. Evid. R. 403 and 404, Neb. Rev. Stat. §§ 27-403 (Reissue 1995) and 27-404 (Reissue 1989); (3) in not finding that the trial court erred in denying Freeman's motion to suppress the DNA evidence; and (4) in not finding that the trial court erred by denying Freeman's motion in limine and in allowing evidence of RFLP DNA statistical results and testing, because there was insufficient foundation for the reliability of the statistics used to calculate the degree of certainty that one could not be a donor of evidence and there was insufficient foundation that the FBI statistical methodology has gained acceptance in the field of population statistics.

### IV. ANALYSIS

#### 1. DENIAL OF MOTION TO SEVER

Freeman argues that the trial court erred in not granting separate trials for the sexual assault charges and their accompanying use of a weapon charges. The consolidation of separate

cases is governed by Neb. Rev. Stat. § 29-2002 (Reissue 1995), which provides as follows:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint . . . if the offenses charged . . . are of the same or similar character . . . .
>
> (2) The court may order two or more indictments, informations, or complaints . . . to be tried together if the offenses could have been joined in a single indictment, information, or complaint . . . .
>
> (3) If it appears that a defendant . . . would be prejudiced by a joinder of offenses . . . in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever relief justice requires.

A defendant opposing joinder of charges has the burden of proving that joinder will be prejudicial to the defendant. See *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995). A defendant has no constitutional right to a separate trial. The right is statutory and depends upon a showing that prejudice will result from a joint trial. *Id.* A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *Id.*

Section 29-2002(1) requires that the charges to be joined for trial must be the same or similar in character. Therefore, we consider the similarity of the assaults, all of which occurred in a 3-month period and have several distinctive characteristics. Each of the crimes involved the sexual assault of a woman by an assailant who was described as an African-American man. In all eight assaults, the assailant constructed a blindfold for the victim, six times with a pillow or pillowcase and two times with the victim's clothing. Seven of the eight victims recalled that when the assailant attempted penetration, he did not initially have an erection. In three of the cases, the victim reported that the assailant rubbed his genitals against her body in order to achieve an erection. Six of the victims testified that while forcibly kissing them, the assailant demanded that they "give him some tongue" or used some similar language. Six of the victims were forced into the bathroom and ordered to wash their

genitals after the sexual assault occurred. Seven of the eight assaults occurred at night or in the early morning hours. Five of the assaults took place either inside or near the victim's apartment building, and in several of the cases, the assault occurred in the victim's bedroom. The assailant attempted to coerce each of the victims through threats, and six of the victims were threatened with death. Based upon § 29-2002(1), we conclude that the offenses charged are of the same or similar character and may be joined in the same trial.

We next consider whether joinder of the charges would be unfairly prejudicial to Freeman. A defendant is not prejudiced by the joinder of charges where the evidence relating to both offenses would be admissible in a trial of either offense separately. *State v. Thompson*, 231 Neb. 771, 438 N.W.2d 131 (1989). The evidence of other crimes need not be identical to the act charged to be admissible under rule 404(2). The evidence will be admitted if it is similar to and reasonably related to the offending conduct and is presented in a manner in which the prejudice does not outweigh its probative value. *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981).

Pursuant to rule 404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. Evidence of other crimes may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. It is within the discretion of the trial court to determine the admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of discretion. *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996).

As we review the record, we find that the evidence relating to each offense would have been admissible in the trial of the other offenses to establish the intent, plan, or method of operation of Freeman. We therefore conclude that Freeman was not unfairly prejudiced by the consolidation of the charges and that the trial court did not abuse its discretion in consolidating the cases for trial.

## 2. EVIDENCE OF PRIOR ATTEMPTED SEXUAL ASSAULTS

We next address Freeman's claim that the court should not have admitted testimony regarding a prior "uncharged" attempted sexual assault. Prior to trial, the State filed a motion stating that it intended to offer evidence of the attempted sexual assaults. The State sought to offer the testimony of L.T. and L.P. regarding the details of two attempted sexual assaults committed by Freeman. The trial court granted the State's motion, apparently finding that the evidence of the prior acts was admissible under rule 404(2) to show the identity, mode of operation, and intent of Freeman.

Rule 404(2) is a rule of inclusion, rather than exclusion, and it permits the use of evidence of prior activity except to prove the character of a person in order to prove that the person acted in conformity with that character. See *State v. Newman, supra.* An appellate court reviews the admission of other acts under rule 404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Carter,* 246 Neb. 953, 524 N.W.2d 763 (1994). Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rules 404(2) and 403, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Eona,* 248 Neb. 318, 534 N.W.2d 323 (1995); *State v. Williams,* 247 Neb. 878, 530 N.W.2d 904 (1995).

Freeman did not complain about the evidence relating to the attempted sexual assault of L.T., and therefore, we do not discuss the admission of this evidence. However, we conclude that the evidence regarding the attempted sexual assault of L.P. was relevant. Sexual crimes are of a nature that evidence of other similar sexual conduct has independent relevance, and such evidence may be admissible against a defendant irrespective of whether that conduct involved the complaining witness or third parties. See *State v. Carter, supra.*

Similarly, we conclude that the evidence of the attempted sexual assault had a proper purpose of establishing Freeman's identity and method of operation. L.P. was attacked as she was attempting to enter her apartment building. The assailant, who was wearing dark clothing, pinned her to the ground and lay on top of her. He displayed a knife and told her that if she did not shut up, he was going to kill her. He then told her that she was going to go with him. This attempted sexual assault occurred within 16 days of three of the eight sexual assaults charged in the case at bar. We cannot say that the trial court abused its discretion in finding that the evidence had the proper purpose of showing the identity, plan, intent, or mode of operation of the assailant because of the similarities with prior incidents.

Where the evidence intended to be offered has qualified under the first two prongs of the test for admission under rule 404(2), i.e., relevance and proper purpose, the determination of whether the evidence is unfairly prejudicial depends upon whether the trial court properly instructed the jury on the limited purpose of the admission of that evidence. See *State v. Carter, supra.* To this end, the trial court gave instruction No. 25, which read as follows: "Evidence of the assaults of [L.T.] and [L.P.] was received for the limited purpose of proving plan, knowledge, and identity and for no other purpose." We conclude that the admission of this evidence was not unfairly prejudicial, and the trial court did not abuse its discretion by admitting this evidence.

### 3. DENIAL OF MOTION TO SUPPRESS DNA EVIDENCE

Freeman argues the Court of Appeals erred in not finding that the trial court erred in denying his motion to suppress the DNA evidence. On February 11, 1994, the State received a court order permitting it to extract blood and saliva samples from Freeman. Freeman refused to comply with the order. He was physically held down, and blood was forcibly drawn from his body. Freeman argues that because the court order provided that if he refused to permit the extraction of his blood and saliva he would be held in contempt, the extraction of such fluids exceeded the authority of the order.

We conclude that this argument has no merit. As the Court of Appeals correctly determined, the officers' actions in obtaining

the blood sample are not a basis for complaint, because the court order was not necessary for the withdrawal of blood against Freeman's will. Neb. Rev. Stat. § 29-3304 (Reissue 1995) provides as follows:

No order shall be required or necessary where the individual has been lawfully arrested, nor under any circumstances where peace officers may otherwise lawfully require or request the individual to provide evidence of identifying physical characteristics, and no order shall be required in the course of trials or other judicial proceedings.

Pursuant to Neb. Rev. Stat. § 29-3301 (Reissue 1995), the term "identifying physical characteristics" includes blood samples and saliva samples.

It is undisputed that Freeman was incarcerated in the Douglas County Correctional Center following a lawful arrest. Therefore, the officers who extracted Freeman's blood sample had authority pursuant to § 29-3304 to require or force Freeman to give them a blood sample.

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997); *State v. McCleery*, 251 Neb. 940, 560 N.W.2d 789 (1997); *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). Therefore, the evidence of the blood sample was properly admissible, and the denial of Freeman's motion to suppress was not clearly erroneous.

### 4. ADMISSION OF STATISTICAL PROBABILITY EVIDENCE

We point out initially that there is nothing controversial about the theory underlying DNA typing, for there is a general scientific acceptance of the theory underlying DNA identification. See *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989).

Freeman argues that the trial court erred in admitting the DNA evidence offered by the State, because the statistical prob-

ability analysis used to establish relevancy was not generally accepted within the scientific community. To aid in understanding Freeman's argument, we set forth a brief explanation of the science of DNA profiling. Additional discussions of the science of DNA and its use in forensics can be found in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994); *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992); *People v. Pizarro*, 10 Cal. App. 4th 57, 12 Cal. Rptr. 2d 436 (1992); and the report of the Committee on DNA Technology in Forensic Science, National Research Council, *DNA Technology in Forensic Science* (1992) (hereinafter the 1992 NRC report).

Contained in the nucleus of every human cell are 46 chromosomes, 23 of which come from the person's biological father and 23 from the biological mother. Each chromosome is made up of genes, the basic unit of heredity. Genes are composed of material known as deoxyribonucleic acid (DNA), which provides a genetic blueprint for cell reproduction. The DNA blueprint is the same in each cell of a person's body and does not change as the person ages.

The differences between individuals are a function of the sequences of the building blocks in a single strand of DNA. For example, everyone has similar sequences in his or her DNA, but each individual will have a different number of sequences in a particular strand of DNA, and as a result, DNA strands can have varying lengths. These repeating sequences of building blocks are known as variable number tandem repeats (VNTR).

The differences in the content and length of the sequences are known as polymorphisms, which are the basis of DNA identification. The location on a DNA molecule where a particular VNTR sequence occurs is known as a locus. A locus is polymorphic if the content and length of VNTR sequences vary from individual to individual at that particular locus.

DNA profiling is done by looking at specific loci on human DNA which are known to be highly polymorphic, that is, where the VNTR sequences are highly variable. One person, for example, may have a VNTR sequence which repeats itself 10 times at a given locus, while another person may have the same VNTR sequence, but it repeats 100 times.

Although there are several million distinguishable polymorphisms among individuals, examination of a small number of known polymorphic loci is sufficient for the purpose of DNA profiling. In criminal cases, a DNA scientist examines four loci along four separate chromosomes to find a DNA pattern. This is called RFLP DNA analysis. This process is performed on a body fluid sample taken from the suspect and a body fluid sample taken from the crime scene to determine if the two samples match.

A comparison of the DNA profiles of the body fluid sample taken from the crime scene and the body fluid sample taken from the suspect is made. Based on this comparison, three conclusions can be reached: (1) The DNA profiles are a "match," (2) the DNA profiles do not match, or (3) the comparison is inconclusive.

From a finding of "no match," one can conclude that the person from whom the sample was taken did not supply the body fluid sample taken from the crime scene. If the DNA profiles are a match, the VNTR sequence and the number of repetitions of that sequence at a particular locus on the DNA strand are identical in both the suspect's DNA and the DNA obtained at the crime scene. It is not accurate to conclude that the match is absolute, because the FBI typically looks at only four to six polymorphic loci on the DNA chain. It is conceivable that two people could have the same VNTR sequence and number of repetitions at the same locus on the DNA strand but have different sequences at other loci on the strand which were not tested. For this reason, in order for any of the DNA samples to be declared matches, there must be matches at all the loci tested. However, to be absolutely certain that the two DNA samples came from the same person, the entire DNA chain would have to be examined. This is not done, and consequently, one can call a matching comparison a match only to a degree of probability.

The FBI employs certain principles of population genetics to assess the likelihood that a random sample of DNA selected from an identified ethnic population would match the known sample. The statistical significance of a match is measured by the frequency with which a particular pattern of VNTR

sequences occurs at a particular locus within specific population groups.

Alternate forms of the same gene are called alleles. A VNTR locus is the site of an allele pattern. The FBI has compiled databases of allele pattern frequencies for at least three different racial or ethnic populations so that probabilities may be calculated: Caucasian, African-American, and Hispanic. The FBI's Caucasian database was derived from blood samples of approximately 750 Caucasians. The African-American database was based on blood samples from 500 African-Americans, and the Hispanic database was compiled from blood samples from 500 Hispanic persons.

The methodology employed by the FBI, as well as a number of other organizations doing DNA-profile probability calculations, is known as fixed-bin analysis. The term "fixed-bin" denotes a procedure by which the DNA scientist sorts polymorphic DNA strands by length and places them into predetermined bins. The frequency of a particular pattern of alleles is then compared to the frequency with which the same pattern of alleles occurs within one of the FBI's three ethnically specific population databases of polymorphic strands of similar size. The fixed-bin analysis is considered a conservative method of assessing DNA profile probabilities, since the frequency of allele patterns occurring in a random sample is higher than it would be if the bins were not utilized.

Once the DNA scientist determines the probability with which one allele pattern occurs in a certain ethnic population, the DNA scientist must calculate the probability of all of the loci matches occurring within that population. One multiplication technique for determining the aggregate probability for the existence of a multiple loci match is known as the product rule. According to the product rule, the alleles at each locus are assumed to vary independently, and therefore, the population frequencies of the patterns at the several loci tested are multiplied together. This number gives the probability that the DNA profile of a person picked at random from a specific population would match the DNA profile of the suspect. See, generally, *People v. Stremmel*, 258 Ill. App. 3d 93, 630 N.E.2d 1301 (1994) (discussing fixed-bin probability calculation method).

Lynch testified that the DNA collected from the blood sample taken from Freeman "matched" each of the body fluid stains taken from the eight sexual assault victims on the basis of analyzing four different DNA loci markers. For seven of the eight matches, Lynch testified that according to the statistical calculations described above, the probability of randomly selecting an unrelated individual from the African-American population having the same DNA profile as Freeman is 1 in 6 million. The probability of randomly selecting an unrelated individual from the Hispanic population with the same DNA profile as Freeman would be 1 in 2 million. The probability of randomly selecting an unrelated individual from the Caucasian population would be 1 in 15 million. For the eighth match, the probability was higher, 1 in only 300, because fewer loci matches were compared.

Freeman's assignment of error is premised on the assertion that the statistical probability analysis used to establish the relevance of the DNA evidence is not generally accepted within the relevant scientific community and therefore fails the "*Frye* test" for the admissibility of novel scientific evidence. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), the issue before the court was whether the *Frye-Houser* requirement of general scientific acceptance applied to the statistical probability calculation step for DNA analysis. See *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992). We held in *Carter* that the calculation of statistical probability was an essential part of the process used in determining the significance of a DNA match and that, therefore, the underlying method of the calculation must also meet the *Frye-Houser* general acceptance test.

The *Frye* test has been used in Nebraska and was formally recognized in *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). The *Frye* test is not totally controlling as to the admissibility of novel scientific testimony, but is only the first of several criteria that a trial court determines are satisfied before such testimony may be admitted. See *State v. Houser, supra.*

In *State v. Carter, supra*, we held that prior to the admission of DNA evidence, the trial court should hold a *Frye* hearing outside the presence of the jury to consider a six-part test for admission, to wit: (1) whether the witnesses on the DNA issue

are experts in the relevant scientific fields, (2) whether DNA profile testing used in the case under consideration is generally accepted by the relevant scientific community, (3) whether the method of testing used in the case under consideration is generally accepted as reliable if performed properly, (4) whether the tests conducted properly follow the method, (5) whether DNA analysis evidence is more probative than prejudicial under rule 403, and (6) whether statistical probability evidence interpreting DNA analysis results is more probative than prejudicial.

Freeman argues that the FBI's method of statistical interpretation of RFLP DNA profiling and determining the probability of a match, the fixed-bin method, has not gained scientific acceptance within the relevant scientific community and, therefore, is not admissible because it fails parts (2) and (3) of the above-described test. Freeman relies on the 1992 NRC report, which allegedly called into question the method used by the FBI to calculate the statistical probabilities regarding DNA profiles, and two cases which held that the specific statistical method used in Freeman's trial is not generally accepted within the relevant scientific community—*People v. Watson*, 257 Ill. App. 3d 915, 629 N.E.2d 634 (1994), and *People v. Barney*, 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731 (1992).

Therefore, we briefly summarize the criticism of the method of calculating the statistical probability of a DNA match. A population geneticist determines the frequency with which a specific allele or VNTR pattern occurs within a given human racial group. In the case of alleles that occur in the anonymous or polymorphic section of an individual's total genetic information, or genome, the likelihood that the samples will match is much smaller, and this reduced likelihood of matches is what gives DNA identification technology its value for forensic purposes. *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989).

> For the alleles to be random in the gene pool two pre-conditions must exist. First, the occurrences of the allele must not be caused by linkage disequilibrium, and second, the relevant racial population as a whole must be in Hardy-Weinberg equilibrium. For these purposes, a population is in equilibrium when there is no correlation between the allele contributed by the mother and the allele contributed

by the father at a particular locus. That is, the alleles are independent of each other. Thus, when two alleles under examination appear on a single chromosome of the parent, the chance that the child received both alleles randomly is lessened. The reason for this is that there is an increased chance that alleles on a single chromosome will be passed on together and then become part of the child's genome. This is more likely than if the alleles were located on different chromosomes. Hence, there is less chance that the alleles were transmitted randomly. When this phenomenon occurs the alleles are linked, and for this allele the population is in linkage disequilibrium. Where the alleles occur on different chromosomes, linkage is not expected to occur except due to external forces of nature. Where there is no linkage, the appearance of the allele in a child may be said to have occurred randomly. When this occurs, the population is not in linkage disequilibrium.

For purposes of Hardy-Weinberg equilibrium it is assumed that allele frequencies will remain constant within a population from generation to generation as long as mating remains random. . . .

. . . .

However, if the population is not in Hardy-Weinberg equilibrium then the alleles are not independent. Thus, the degree of dependency between the alleles must be calculated. Calculations may also be obtained by finding the actual, not projected, frequency in the population. This may be accomplished using larger populations, reference populations to determine genotype frequencies, or by considering only one allele. Conservative or reduced calculations may also correct the Hardy-Weinberg deviation problems. With deviations from Hardy-Weinberg equilibrium the frequency of the allele in the population, and thus the uniqueness of the fingerprint, can be in question but this is not necessarily related to the validity of the match.

*Id.* at 967-68, 545 N.Y.S.2d at 992-93. Accord *People v. Pizarro*, 10 Cal. App. 4th 57, 12 Cal. Rptr. 2d 436 (1992).

In summary, two scientists, Drs. R.C. Lewontin and Daniel L. Hartl, question the accuracy of the product rule discussed earlier. A fundamental principle of the product rule is that each

allele is statistically independent and that one may calculate the probability of finding another person who has the same DNA pattern as the suspect by multiplying the probability of a matching VNTR locus by the probability of the other matching VNTR locus occurring in a specific FBI database. The study by Lewontin and Hartl suggests that the mating patterns of ethnic, religious, or other culturally significant substructures may affect the way in which alleles combine on a DNA chain. This means that if a member of a certain race were to mate with a person from the same race, there is an increased chance that certain alleles would be found in pairs on the DNA chains in their offspring. Lewontin and Hartl questioned the accuracy of the product rule because it does not account for the effect that a substructure population's mating patterns has on the location of alleles on the DNA strand. See R.C. Lewontin & Daniel L. Hartl, *Population Genetics in Forensic DNA Typing*, 254 Science 1745 (1991) (the 1991 Lewontin and Hartl article). See, also, Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 Nature 735 (1994).

In *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), we determined that the task of this court is not to decide the underlying validity of the methods employed in calculating population frequencies, but to determine whether the methodology has gained general acceptance. Relying upon the 1992 NRC report, we concluded that the product rule had not gained general acceptance.

In the case at bar, the trial court held a *Frye* hearing, at which the State offered the testimony of two expert witnesses regarding the DNA evidence—Lynch, a special agent in the DNA analysis unit of the FBI, and Dr. Ranajit Chakraborty, a professor of population genetics at the University of Texas-Houston Health Science Center.

Chakraborty testified that the fixed-bin method of calculating probability statistics regarding a particular DNA profile is currently generally accepted in the scientific community. Chakraborty stated that he was aware of the 1991 article by Lewontin and Hartl which made theoretical challenges to the use of the fixed-bin method. However, Chakraborty explained that advances in the study of DNA profile databases and the

study of statistical probability issues since 1991 have answered the objections of Lewontin and Hartl and that the relevant scientific community now holds that the use of the fixed-bin method is appropriate for calculating statistical probabilities.

Chakraborty testified that the current size of the databases used in the FBI's fixed-bin analysis is sufficient to answer Lewontin and Hartl's concerns about substructure mating patterns. Chakraborty stated that prior to the hearing, he had attended an international conference on DNA fingerprinting which was attended by more than 500 DNA scientists. One of the panel discussions he attended included a presentation on the compilation of the various DNA typing databases. The existence of these various databases indicates that the DNA typing databases are "far more than sufficient" to do any profiling probability calculation using the fixed-bin method.

Chakraborty testified that empirical laboratory work has proved that the impact of possible genetic substructures is negligible. The current state of research is that the effect of substructures can be ignored for purposes of DNA typing data. Chakraborty also noted that Hartl published an article in approximately 1993 in which Hartl appeared to drastically change his opinion about the product rule. Chakraborty testified that in that article, Hartl changed his earlier conclusion that DNA typing, which used the product rule and fixed-bin analysis, should not be used in court.

Moreover, Chakraborty testified that he had just presented a paper in which he analyzed the frequency of a certain type of DNA marker in more than 150 different subcultures of the world. Based on his analysis, he determined that the effect of substructuring on distribution of various genetic markers is "very minimal." As a result, there is no population for which the Hardy-Weinberg principle, which is the theoretical basis for the product rule, does not apply.

The State also placed in evidence Lander and Budowle's article, see Lander & Budowle, *supra.* In this article, Lander and Budowle, two experts in the debate over use of the product rule, report that the controversy which led to the 1992 NRC report and questioning of the use of the product rule has been resolved. The article suggests that the consensus of the relevant scientific

community is that use of the product rule, though it is not the most conservative approach to DNA profile probability assessment conceivable, is sufficiently conservative to be used for the practical purposes for which it is used in a criminal case.

The article states that the controversy over probability evidence and its use in the courtroom occurred over a misunderstanding of the 1992 NRC report. The article explains that contrary to what some lawyers and courts have determined, the 1992 NRC report did not entirely discredit use of the product rule in the courtroom. Instead, the 1992 NRC report pointed out that the ceiling approach was a more conservative method of calculating probabilities. The authors stressed that "[m]ost important, the report failed to state clearly enough that the ceiling principle was intended as an ultra-conservative calculation, which did not bar experts from providing their own 'best estimates' based on the product rule. This failure was responsible for the major misunderstanding of the report." Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 Nature 735, 737 (1994).

Lander and Budowle state that as a practical matter, the ceiling method provides an ultraconservative method of probability assessment which eliminates any concerns regarding the possibility of substructure influence on probabilities. However, the distinction between the ceiling method and the product rule method is largely irrelevant in the courtroom. *Id.*

Freeman did not offer any rebuttal witnesses, but, instead, offered two exhibits: a copy of the 1991 Lewontin and Hartl article regarding the use of the product rule in DNA probability analysis and a copy of the 1992 NRC report. After hearing this testimony and receiving a number of journal articles and other professional materials regarding population genetics, the trial court concluded that use of the fixed-bin statistical probability analysis is generally accepted in the relevant scientific community. The trial court explained the basis for its determination as follows:

> The . . . testimony is uncontradicted. It was that Lewontin and Hartl's theory was theory only and it has been discredited by the scientific community in the United States and worldwide as being a theory that just didn't work out at the lab.

Therefore, the references in the <u>Asa Carter</u> by our Supreme Court are references that are no longer accepted by the scientific community in this country or anywhere in the world. They relied heavily in <u>Asa Carter</u> on Lewontin and Hartl's theory about subcultures, and the opinion goes on and on and on about the impossibility of getting a data base which would take it into account.

[Lewontin and Hartl's theory] has been tested and disproved by the entire scientific community, and the conclusions reached—Or the theories have been discredited by at least all the scientific community that there's certainly no evidence that there's any—any controversy raging at all now. The evidence is overwhelming that the controversy that they created by their theories has long ended.

Courts considering the admissibility of statistical probability evidence such as that at issue in the present case overwhelmingly confirm the trial court's decision to admit the evidence. See, *People v. Johnson*, 262 Ill. App. 3d 565, 634 N.E.2d 1285 (1994); *People v. Stremmel*, 258 Ill. App. 3d 93, 630 N.E.2d 1301 (1994); *People v. Wesley*, 83 N.Y.2d 417, 633 N.E.2d 451, 611 N.Y.S.2d 97 (1994); *People v. Mehlberg*, 249 Ill. App. 3d 499, 618 N.E.2d 1168 (1993); *State v. Dykes*, 252 Kan. 556, 847 P.2d 1214 (1993); *State v. Futrell*, 112 N.C. App. 651, 436 S.E.2d 884 (1993); *U.S. v. Bonds*, 12 F.3d 540 (6th Cir. 1993); *State v. Montalbo*, 73 Haw. 130, 828 P.2d 1274 (1992); *Woodcox v. State*, 591 N.E.2d 1019 (Ind. 1992); *People v Adams*, 195 Mich. App. 267, 489 N.W.2d 192 (1992); *State v. Pierce*, 64 Ohio St. 3d 490, 597 N.E.2d 107 (1992); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Satcher v. Com.*, 244 Va. 220, 421 S.E.2d 821 (1992); *U.S. v. Jakobetz*, 955 F.2d 786 (2d Cir. 1992); *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991); *People v. Axell*, 235 Cal. App. 3d 836, 1 Cal. Rptr. 2d 411 (1991); *People v. Miles*, 217 Ill. App. 3d 393, 577 N.E.2d 477 (1991); *People v. Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345 (1991); *State v. Brown*, 470 N.W.2d 30 (Iowa 1991); *U.S. v. Yee*, 134 F.R.D. 161 (N.D. Ohio 1991). These cases discuss a wide variety of materials addressing the controversy discussed in the 1992 NRC report, and each of these courts concluded that the widespread consensus of scientists

involved in population genetics is acceptance of the use of the product rule for the determination of the relative probability of finding a match between a DNA sample from a suspect and DNA material found in a sample of body fluid recovered from a crime scene.

It is also helpful to note that a recent case discussing use of DNA statistical evidence such as that at issue in the present case states that a 1996 update to the 1992 NRC report has concluded that use of the product rule is generally accepted in the relevant scientific community. In *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (1997), the Massachusetts Supreme Judicial Court determined that the court's concerns with DNA statistical probability calculations in connection with the use of the product rule have been alleviated by the change in opinions within the scientific community regarding the effect of substructures on probability assessment. The *Rosier* court noted that the 1996 update to the 1992 NRC report clearly indicates that the concerns raised in the 1992 NRC report are no longer valid and that the product rule is a proper method of statistical probability analysis that is suitable for use in the courtroom. See, also, *Commonwealth v. Fouler*, 425 Mass. 819, 685 N.E.2d 746 (1997) (product rule now meets test of scientific reliability); *State v. Kinder*, 942 S.W.2d 313 (Mo. 1996) (NRC has withdrawn criticism of product rule in 1996 report).

Freeman argues that two courts have rejected use of the product rule on the basis of the 1991 Lewontin and Hartl article and the 1992 NRC report. See, *People v. Watson*, 257 Ill. App. 3d 915, 629 N.E.2d 634 (1994); *People v. Barney*, 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731 (1992). However, Freeman's reliance on these two opinions is misplaced. As this court did in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), the *Barney* and *Watson* courts based their analysis on the state of the scientific evidence immediately following the 1991 Lewontin and Hartl article and the 1992 NRC report. Naturally, scientific opinion on a particular scientific matter is not static, and therefore, a determination of whether a particular type of novel scientific evidence is or is not generally accepted within the scientific community must consider the current state of the science.

In view of the current scientific consensus affirming use of the product rule to assess the probability of a suspect's DNA profile, we hold that the trial court did not abuse its discretion in admitting the evidence of FBI probability analysis in Freeman's case. To the extent that *Carter* is based on an outdated level of acceptance of this evidence by the relevant scientific community, it is overruled.

## V. CONCLUSION

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact; a conviction will be affirmed in the absence of prejudicial error if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996).

We find that the evidence was sufficient to sustain the convictions, and we affirm the decision of the Court of Appeals.

AFFIRMED.

McCORMACK, J., participating on briefs.